# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Michelle L. Brooks,                                        Civil No. 11-625 (RHK/JJG)

     Plaintiff,

v.                                                        **REPORT AND RECOMMENDATION**


Michael J. Astrue,

Commissioner of Social Security,

     Defendant.

---

JEANNE J. GRAHAM, United States Magistrate Judge

  Plaintiff Michelle Brooks (Brooks) seeks judicial review of the denial of her applications for disability insurance benefits (DIB) and social security income (SSI) under the Social Security Act.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).  The case was referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), and is presently before the Court on cross-motions for summary judgment (Doc. Nos. 7, 12).  For the reasons set forth below, the Court recommends that Brooks' motion for summary judgment be denied, and Defendant's motion for summary judgment be granted.

## I.  BACKGROUND

  Brooks filed an application for disability insurance benefits on June 16, 2009, and for supplemental security income on July 10, 2009, alleging a disability onset date of September 2, 2007, when she was 32-years-old.  (Admin. R. at 177-87.)[1]  She alleged disability from

---

[1] Brooks filed earlier applications in February 2008, but did not pursue her administrative appeals.  (Admin. R. at 166-76, 42-43.)

depression, anxiety, stress, osteopenia, chronic back pain, headaches, and medication side effects.  (*Id.* at 303.)  Brooks worked as a machine operator from 1999 through 2003, a personal care attendant ("PCA") from July 2004 through December 2006; and a certified nursing assistant ("CNA") from April 2007 through September 2007.  (*Id.* at 304.)  In 2007, she took medical leave to have surgery, and never returned to work.  (*Id.* at 303.)  Brooks testified at a hearing before an administrative law judge ("ALJ"), and the ALJ denied her disability claim on October 1, 2010.  (*Id.* at 10-27, 28-60.)  The Appeals Council denied review, and Brooks filed this action for judicial review on March 11, 2011.  (*Id.* at 1-5.)

A.    **Medical Evidence in the Administrative Record**

On May 25, 2007, a few months before her alleged disability onset date, Brooks was evaluated by Dr. Bryan Petersen at Glencoe Regional Health Services ("Glencoe").  (Admin. R. at 421-22.)  Brooks was taking Topamax for daily headaches, and she thought it might be the cause of her fatigue.  (*Id.* at 421.)  She was also taking Claritin, Paxil, Advair, Nasonex, albuterol and tramadol.  (*Id.*)  Brooks complained of feeling more anxious lately, with panic attack symptoms and greater depression.  (*Id.*)  She felt dazed and irritable, and easily lost her temper. (*Id.*)  Dr. Petersen diagnosed side effects from Topamax, and worsening depression and anxiety. (*Id.* at 421.)  He discontinued Topamax and prescribed Lyrica.  (*Id.*)

Three weeks after her alleged disability onset date of September 2, 2007, Brooks saw Dr. Petersen for pelvic pain.  (*Id.* at 412-13.)  She had a history of dysfunctional uterine bleeding, unimproved by Depo-Provera.  (*Id.* at  412.)  Brooks also told Dr. Petersen that she stopped taking Lyrica, and her daily headaches were about the same.  (*Id.*)  A CT scan of her head was normal.  (*Id.* at 413.)  Dr. Petersen opined Brooks' headaches seemed to be tension or vascular type.  (*Id.*)  Brooks' restless legs were also bothering her, and Dr. Petersen recommended a trial

of Mirapex.  (*Id.* at 412.)   Brooks had taken a leave of absence from work, and Dr. Petersen

suggested it would be three or four weeks before she would be ready to return to work, longer if

she required surgery.  (*Id.*)  Brooks had endometrial ablation surgery on October 15, 2007.  (*Id.*

at 817.)

Brooks had also been seeing Dr. Steve Karg, a chiropractor, and she returned for follow-

up on her back pain on November 19, 2007.  (*Id.* at 385-86.)  She reported constant low back

pain, unrelated to an injury.  (*Id.* at 385.)  She was unable to stand or sit for extended periods of

time, which interfered with her daily activities.  (*Id.*)  On examination, Brooks had decreased

range of motion in the lumbar spine, and was tender over the paralumbar muscles.  (*Id.*)  Several

months later, in February 2008, Brooks had an MRI of her lumbar spine. (*Id.* at 371-72.)  The

MRI showed transitional lumbosacral junction with lumbarization of S1,[2] a unilateral accessory

articulation on the left,[3] and a small centrally located disc protrusion with associated annular tear

at L5-S1, with mild dessication.  (*Id.* at 371.)

On February 25, 2008, Brooks saw Dr. Petersen for several concerns.  (*Id.* at 406-07.)

Her chronic back pain was getting worse, and kept her awake at night.  (*Id.* at 406.)  She had also

been taking Paxil for a year-and-a-half, but was not sure it was helping, because she had trouble

concentrating in class.  (*Id.*)  She felt spacey and had difficulty doing her school work. (*Id.*)  She

wondered whether taking Paxil and tramadol together was causing an interaction.  (*Id.*)  On

examination, Brooks' back was minimally tender in the lower lumbar region, and straight leg

raise test was negative.  (*Id.* at 407.)  Neurologically, her lower extremities were intact,

---

[2] Lumbarization is a condition where the first segment of the sacrum is not fused with the second, so that there is one additional articulated vertebra, and the sacrum consists of only four segments.  *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") 1092 (31st ed. 2007).

[3] Accessory means supplementary, and articulation means a joint or place of junction between two or more different parts.  *Dorland's* at 11 and 1162.

symmetric bilaterally, nonfocal, and with equal strength and sensation.  (*Id.*)  Dr. Petersen prescribed Vicodin, and switched Brooks from Paxil to Lexapro.  (*Id.*)

Brooks was evaluated for low back pain by Dr. Francis Denis at Glencoe on March 3, 2008.  (*Id.* at 439-41.)  Brooks' low back pain started in 1995, but was much worse in the last year or two.  (*Id.* at 439.)  She could only sit or stand for thirty minutes.  (*Id.*)  On physical examination, Brooks' gait was normal.  (*Id.* at 440.)  Peripheral and vascular exams were normal. (*Id.*)  Brooks could fully flex and extend, but had some pain in the lower back on forward flexion. (*Id.*)  X-rays of the lumbar spine taken that day showed mild L5-6 spinal listhesis,[4] without motion at the L6-S1 segments.  (*Id.*)  Dr. Denis also reviewed the July 2007 lumbar MRI, and diagnosed disc degeneration with stenosis at L5-6.  (*Id.*)  Because Brooks had a long history of symptoms, and tried many different treatments without lasting relief, discography was recommended, and was consistent with a disc abnormality at L5-6.  (*Id.* at 398-99, 440-41.)  On April 8, 2008, Brooks had anterior spinal fusion at L5-6.  (*Id.* at 445-47.)

Three weeks after surgery, Brooks underwent a consultative psychological evaluation. (*Id.* at 469-70.)  Brooks told the evaluator, Dr. Madeline Barnes, that her depression increased over the past year.  (*Id.* at 469.)  Brooks was first diagnosed with depression 23 years earlier, but had only seen a therapist once or twice.  (*Id.*)  She had symptoms of a "short fuse," and tightness in her chest when anxious.  (*Id.*)  Brooks appeared to be in pain and somewhat dysphoric.  (*Id.*) She was stressed and overwhelmed by the interview.  (*Id.*)

At the time of the interview, Brooks lived in a house with her two children, her fiancée, her mother and stepfather, and her brother, his wife, and their two children.  (*Id.*)  Her fiancée

---

[4] The prefix "spondylo" means vertebra, and spondylolisthesis is the forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum. *Stedman's Medical Dictionary* ("*Stedman's*") 1678 (27th ed. 2000).

also had children who visited on the weekend.  (*Id.*)  Brooks could cook simple meals, but could not lift more than five pounds.  (*Id.*)  She needed help drying herself off after showering, which was the only time she took her back brace off.  (*Id.*)  Brooks got her children ready for school each day; then, she spent the rest of the day in bed.  (*Id.*)  Brooks enjoyed reading.  (*Id.*)  After dinner, she watched television and went to bed at 8:00 p.m.  (*Id.*)  She went out very rarely, and avoided shopping if she could.  (*Id.*)  She found driving painful.  (*Id.*)  Short daily walking was her only exercise.  (*Id.*)

Brooks avoided interacting with other adults because she was not "a people person."  (*Id.* at 470.)  She got along with her children, but not with the rest of her family.  (*Id.*)  She did not have any friends, because she did not want to talk to anyone.  (*Id.*)  Brooks appeared stressed and overwhelmed, and her short temper was evident.  (*Id.*)  Brooks said she became anxious when frustrated, she was depressed all the time, her appetite was poor, her sleep was erratic, and she was fatigued most of the time.  (*Id.*)  In the interview, however, Brooks was alert and oriented.  (*Id.*)  She completed a number of mental tasks accurately and quickly.  (*Id.*)  Her memory was generally intact, and her concentration was sufficient for moderately complex tasks.  (*Id.*)

Dr. Barnes diagnosed major depression, and assessed a GAF score of 45, noting Brooks might function better if she had psychotherapy.  (*Id.*)  Dr. Barnes assessed Brooks' ability to work:

> Ms. Brooks is intellectually capable of learning, recalling and performing somewhat complex tasks, and can sustain concentration and pace on such tasks for limited periods of time. She fatigues quickly, however, so likely could not sustain these for a full work day.  She has some social skills, and can get along with coworkers and supervisors, though mostly by avoiding interacting with them.  Under stress, she is likely to become quite irritated and lose her temper, creating problems with coworkers and supervisors.  She may also become quite overwhelmed under

minimal stress, as was apparent during the interview.  She is likely
to find change in the workplace equally overwhelming.

(*Id.*)

Brooks followed up with Dr. Denis on May 12, 2008, five weeks after lumbar surgery.
(*Id.* at 535.)  Her back was aching, and she had problems with her back brace, but she was able to
walk every day.  (*Id.*)  She had been taking a large amount of narcotics.  (*Id.*)  X-rays taken that
day showed her spinal fusion was intact.  (*Id.*)  Dr. Denis recommended that Brooks decrease her
narcotic use and wear her back brace full-time.  (*Id.*)

On June 11, 2008, Dr. D. Unversaw reviewed Brooks' social security file, and opined
Brooks would have difficulty handling work-like pressures and changes.  (*Id.* at 488.)  However,
she had sufficient cognitive skills to understand, retain, and follow through with simple
instructions and routine decision making.  (*Id.*)  Because Brooks spent considerable time reading
or watching television during the day, she would have sufficient attention and concentration
skills.  (*Id.*)  Given her combined physical and emotional impairments, Brooks would likely have
some problems with overall persistence.  (*Id.*)  Because Brooks was irritable in times of stress,
she would do best in a setting without much interaction with others.  (*Id.* at 489.)  Dr. Unversaw
believed the consultative examiner underrepresented Brooks' actual activities, based on
Disability Report forms completed by Brooks and third-parties.  (*Id.*)  Dr. Ray Conroe affirmed
Dr. Unversaw's opinion on September 10, 2008, based on his review of the record.  (*Id.* at 523-
25.)

On June 17, 2008, Dr. George Salmi reviewed Brooks' social security file, and opined
that Brooks could lift and/or carry twenty pounds occasionally and ten pounds frequently.  (*Id.*
at 491.)  Brooks could sit, stand and/or walk six hours each, in an eight-hour workday.  (*Id.*)  She
would be limited to the following on an occasional basis:  climbing ramps and stairs, balancing,

stooping, kneeling, crouching and crawling.  (*Id.* at 492.)  She could never climb ladders, ropes or scaffolds.  (*Id.*)  Dr. Charles Grant reviewed Brooks' file, and affirmed Dr. Salmi's opinion on September 10, 2008.  (*Id.* at 526-28.)

Brooks saw Dr. Petersen on July 3, 2008, still in a lot of pain after fusion surgery, but her surgeon wanted her to decrease her narcotic use.  (*Id.* at 511-13.)  She was wearing her back brace as prescribed.  (*Id.*)  Her back was a little tender on examination, and straight leg raise test was negative.  (*Id.* at 512.)  Brooks was moving to a new home, and her boyfriend[5] was working out of town, so she had to do a lot of packing and lifting, even though she was on a five pound weight restriction after surgery.  (*Id.*)  She strained her back, and required Percocet[6] every four to six hours.  (*Id.*)  Brooks' anxiety was worsening, and she wanted to increase her Celexa.  (*Id.* at 511.)

Later that month, Brooks saw Dr. William Phillips in place of Dr. Petersen.  (*Id.* at 517-18.)  Brooks had been doing a lot of lifting, and aggravated her back pain.  (*Id.* at 517.)  She was unable to do much around the house, and this caused stress in her marriage.  (*Id.*)  She asked for another increase in Celexa.  (*Id.*)  Brooks signed an agreement regarding her narcotic use for chronic pain, and Dr. Phillips prescribed Percocet.  (*Id.* at 518.)

After feeling a pop in her back while helping friends lift a door, Brooks saw Dr. Phillips for back pain on September 19, 2008.  (*Id.* at 573.)  She had back pain off and on over the summer, and it was very tender after the lifting incident.  (*Id.*)  Brooks had very limited range of motion.  (*Id.*)  On examination, she was tender over the incision site and the paraspinous

---

[5] In the medical records, Brooks' significant other was variously referred to as her fiancée, boyfriend or husband.

[6] Percocet, a brand name for the generic drug oxycodone hydrochloride and acetaminophen, is a Schedule II controlled substance with abuse potential, indicated for treatment of moderate to moderately severe pain. *Physician's Desk Reference* ("*PDR*") 1096-98 (65th ed. 2011).

muscles. (*Id.*) Deep tendon reflexes were normal, and straight leg raise tests were negative. (*Id.*) Dr. Phillips diagnosed probable acute musculoskeletal back pain and chronic low back pain. (*Id.*) An MRI of Brooks' lumbar spine on September 23, 2008, showed compression fracture at L1, no canal stenosis, no cord compression or neural impingement, post-operative changes from spinal fusion, and a transitional lumbosacral segment. (*Id.* at 605-06.)

Brooks was taking her medications without difficulty in November 2008. (*Id.* at 567.) On examination, Brooks had increased back stiffness and decreased range of motion. (*Id.*) On December 17, 2008, Brooks asked for an increase in Cymbalta. (*Id.* at 563.) She was under a lot of stress, and planned on taking her kids and moving in with her mother, while her mother recovered from knee surgery. (*Id.*) Dr. Phillips recommended physical therapy and counseling, but that would be on hold while Brooks cared for her mother. (*Id.*)

In January 2009, Cymbalta and Celexa were working well for Brooks. (*Id.* at 562.) She had been using trazadone to sleep, but it made her feel confused, so she asked for zolpidem. (*Id.*) On examination, Brooks was obviously under stress, but was alert and oriented, with baseline tangential speech. (*Id.*) Dr. Phillips prescribed propranolol for prophylactic headache treatment, and zolpidem for sleep. (*Id.*) In February, Brooks asked Dr. Phillips for a long-acting pain medication, but he declined. (*Id.* at 560-61.) The following month, Dr. Phillips noted that he was trying to get Brooks into the MAPS Pain Clinic, because he could not continue to prescribe narcotics long-term. (*Id.* at 558-59.) Dr. Phillips told Brooks she absolutely needed to follow up on the referrals he made to a counselor and the MAPS Pain Clinic. (*Id.* at 557.)

In May 2009, Brooks was having difficulty making or keeping appointments, because she was caring for her elderly mother. (*Id.* at 553.) Brooks was advised to follow up with her

appointments, and she was prescribed morphine, Percocet and lorazepam.[7]   (*Id.*)   Gabapentin was discontinued, because it did not help and made her tired.   (*Id.*)   The next month, Brooks asked for an increase in her anti-depressant.   (*Id.*)   She had not followed-up with seeing a counselor.   (*Id.*)   Dr. Phillips prescribed an increase in Cymbalta and lorazepam, and recommended that Brooks follow through with a prescription of Lyrica from MAPS Pain Clinic. (*Id.*)  Brooks also reported pain in her right knee, and Dr. Phillips prescribed Percocet.  (*Id.*)

Brooks underwent a second consultative psychological examination on August 24, 2009, with Dr. Lorraine Hoffman.   (*Id.* at 653-56.)   Brooks moved about slowly and awkwardly, apparently in pain.  (*Id.* at 653.)  Brooks had a stressful relationship with her boyfriend, and her mother recently moved into assisted living.  (*Id.*)  Brooks had been in college studying nursing, but quit, because her grandmother, who had been caring for her children while she was in school, passed away.  (*Id.*)  Brooks had constant pain in her back, hips and head.  (*Id.*)  Her medications included lorazepam, Celebrex, Cymbalta, Singulair, Detrol, morphine, Nexium, zolpidem, Percocet and albuterol.  (*Id.*)

Brooks said she could not work due to pain, and her mental state.  (*Id.*)  She could not concentrate, and people made her nervous.  (*Id.*)  Her depression had been worse since May. (*Id.*)  Some days she cried, or she was frustrated and threw things.  (*Id.*)  When she felt anxious around people, her chest tightened, she shook and had trouble breathing.  (*Id.*)  She also had trouble sleeping, and did not eat much.  (*Id.*)

---

[7] Lorazepam, also sold under the brand name Ativan, is indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety, or anxiety associated with depressive symptoms.  Anxiety or tension associated with the stress of everyday life usually does not require treatment with an anxiolytic.   http://www.rxlist.com/ativan-drug/indications-dosage.htm

Brooks described her typical day.  (*Id.*)  She woke up between 9:00 and 11:00 a.m.  (*Id.*)  She tried to do things around the house, but could not because she had no energy.  (*Id.*)  She made easy meals.  (*Id.*)  She fought with her 11-year-old son all day.  (*Id.*)  She found it hard to socialize.  (*Id.*)  Brooks had no interests or activities.  (*Id.*)  She had trouble keeping up with her grooming.  (*Id.*)  She needed help with everything on a daily basis.  (*Id.*)  She went to bed after midnight.  (*Id.*)

During the interview, Brooks' mood was very depressed, and she looked tired and cried.  (*Id.* at 656.)  On examination, her concentration skills and short-term memory skills were poor.  (*Id.*)  Her fund of knowledge was also poor.  (*Id.*)  Dr. Hoffman diagnosed major depression, recurrent and severe; and assessed a GAF score of 55.  (*Id.*)  Dr. Hoffman stated:

> Michelle's ability to concentrate and attend is poor.  She is able to understand questions and instructions.  Her depression, poor concentration, poor short-term memory, and her reported problems with pain are significantly impairing her ability to carry out tasks with reasonable persistence and pace.  Due to her depression and anxiety, she may have some problems with appropriate responsiveness with co-workers and supervisors.  Michelle does not appear able to manage the stress of a work environment.

(*Id.*)

On October 1, 2009, Dr. R. Owen Nelsen reviewed Brooks' social security file, and found Brooks to have the mental residual functional capacity for routine, repetitive, 3-4 step work with ordinary levels of supervision, and brief and superficial contact with co-workers and the public.  (*Id.* at 677.)  Dr. Sandra Eames affirmed Dr. Nelsen's opinion on January 17, 2010.  (*Id.* at 729-31.)  Dr. Dan Larson also reviewed Brooks' social security file in October 2009, and opined that Brooks was capable of light work with the following postural limitations:  never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch, and crawl.  (*Id.* at 681.)  Dr. Larson did not find objective evidence to

support the degree of severity Brooks claimed.  (*Id.* at 684.)  Dr. Cliff Phibbs reviewed Brooks'

file, and affirmed Dr. Larson's opinion on December 29, 2009.  (*Id.* at 726-28.)

Dr. Petersen wrote a letter supporting Brooks' disability claim on October 31, 2009.  (*Id.*

at 717.)  He opined Brooks' chronic low back pain restricted her from heavy lifting, repeated

stooping and bending, and lifting more than ten pounds on a regular basis.  (*Id.*)  He also noted

Brooks' major depression and anxiety were significant problems for her.  (*Id.*)  Furthermore, she

had a bladder problem, requiring use of adult undergarments.  (*Id.*)  Her other medical problems

included hyponatremia,[8] hypocalcemia, history of gastric bypass, asthma, history of restless leg

syndrome, and history of carpal tunnel syndrome.  (*Id.*)  Dr. Petersen did not believe Brooks

could work in any gainful employment for at least a year.  (*Id.*)

Brooks saw Dr. Petersen on December 4, 2009.  (*Id.* at 745-49.)  She needed a refill of

Percocet for breakthrough pain, although Kadian[9] was working well for her chronic pain at the

current dose.  (*Id.* at 748.)  Brooks' depression and anxiety were somewhat better after her 17-

year-old step-child moved out.  (*Id.*)  Dr. Petersen questioned whether Brooks had bipolar

disorder, because she sometimes stayed up very late cleaning, and at times had more energy than

others.  (*Id.*)  He did not think she had a full manic episode, but wondered if a different

medication might help.  (*Id.*)  He made a referral to a psychiatrist.  (*Id.* at 748-49.)

Brooks went to an emergency room for treatment of a severe headache on December 17,

2009.  (*Id.* at 750-51.)  She felt dizzy, weak and short of breath.  (*Id.* at 750.)  Brooks also said

---

[8] Hyponatremia is deficiency of sodium in the blood.  *Dorland's* at 916.

[9] Kadian, a brand name for the generic drug morphine sulfate extended-release, is a Schedule II controlled substance with abuse potential, indicated for treatment of moderate to severe pain when a continuous, around-the-clock, opioid analgesic is needed for an extended period of time. http://www.rxlist.com/kadian-drug.htm,    and    http://www.rxlist.com/kadian-drug/indications-dosage.htm

she had not taken Ativan in a few days and had run out of Buspar.  (*Id.*)  Brooks was treated with saline, Lasix, and Ativan; and her symptoms dramatically improved.  (*Id.* at 750-51.)

Brooks had an MRI of her lumbar spine on January 4, 2010.  (*Id.* at 764-65.)  The MRI showed chronic compression fracture of L1; no acute fracture or new finding; fusion without central canal or foraminal stenosis, and transitional appearance of S1 segment.  (*Id.*)  Brooks saw Dr. Petersen for follow-up two months later.  (*Id.* at 782-87.)  She missed a couple physical therapy appointments and had not made an occupational therapy appointment.  (*Id.* at 782, 797.)  Brooks was taking six tablets of lorazepam per day, and said her anxiety was not sufficiently controlled.  (*Id.*)  Dr. Petersen told Brooks she could not take six lorazepam per day.  (*Id.* at 787.)  He continued Brooks on Buspar, but tapered Cymbalta and started Savella.[10]  (*Id.*)  Dr. Petersen also noted Brooks was using a tens unit, and it helped her back pain.  (*Id.*)

Brooks had a CT scan of her head on March 31, 2010, to evaluate her recurrent headaches.  (*Id.* at 795-96.)  The results were unremarkable.  (*Id.*)  Two weeks later, Brooks reported that Savella helped her depression and chronic pain.  (*Id.* at 1045.)  Brooks had chronic daily headaches and a couple migraine headaches per month, and a CT scan ruled out sinusitis. (*Id.*)  Brooks further complained of right hand numbness.  (*Id.*)  Dr. Petersen recommended an EMG, noting Brooks had a little atrophy in the right hand.  (*Id.* at 1045-46.)  Brooks' asthma was stable on Advair and Singulair.  (*Id.* at 1049.)  Her physical examination was normal with the following exceptions:  slightly antalgic gait, loss of lumbar lordosis, and restricted flexion and extension of the back.  (*Id.*)  Brooks was able to slowly squat all the way down and stand up, but not repetitively.  (*Id.*)

---

[10]  Savella is indicated for the management of fibromyalgia.   http://www.rxlist.com/savella-drug/indications-dosage.htm

Brooks' primary reason for the visit was to fill out paperwork for her disability claim. (*Id.* at 1046.)  Dr. Petersen wrote a letter summarizing his treatment of Brooks, and opining Brooks was disabled by chronic pain, complicated by chronic depression and anxiety.  (*Id.* at 908-09.)  He noted Brooks' MRIs demonstrated fusion at L5-6, compression fractures at T12 and L1, a history of disc protrusion at L5-S1, and history of compression fractures at T8 and L1. (*Id.* at 908-09.)  Brooks' prognosis was poor, with little sign of improvement for 4-5 years.  (*Id.* at 909.)  Dr. Petersen opined Brooks could not work in full-time competitive employment due to her multiple diagnoses.  (*Id.*)

Dr. Petersen completed a multiple impairment questionnaire on April 28, 2010.  (*Id.* at 911-18.)  He diagnosed Brooks with degenerative spine disease, back pain, depression, chronic pain, chronic enuresis,[11] restless leg syndrome, chronic daily headache, history of chronic migraine, chronic insomnia, and right carpal tunnel syndrome.  (*Id.* at 911.)  Based on Brooks' impairments, Dr. Petersen opined she could sit for only one hour, and stand or walk one to two hours in an eight-hour workday.  (*Id.* at 913.)  He opined Brooks could lift five pounds frequently, and up to twenty pounds occasionally, but could only carry up to ten pounds occasionally, and five pounds frequently.  (*Id.* at 914.)  Right carpal tunnel syndrome limited her ability to use her hands repetitively.  (*Id.*)

Dr. Petersen opined Plaintiff's pain, fatigue and other symptoms would frequently interfere with her attention and concentration.  (*Id.* at 916.)  Emotional factors contributed to her symptoms and functional limitations.  (*Id.*)  Brooks would be capable of only low stress work, due to her pain, stress and irritability.  (*Id.*)  She would need to rest every hour, and she would likely miss three or more days of work per month.  (*Id.* at 917.)  Dr. Petersen also opined Brooks

---

[11] Enuresis is involuntary discharge or leakage of urine.  *Stedman's* at 601.

would need to avoid noise, fumes, gases, temperature extremes, and could not push, pull, bend or stoop.  (*Id.*)  These limitations applied, at the earliest, in 2004.  (*Id.*)

On September 23, 2010, Brooks submitted to the SSA an undated letter from Lynnette Christopherson, who had been providing social services to Brooks for the last two months.  (*Id.* at 1054.)  Christopherson said she witnessed Brooks' difficulty with pain and maintaining daily functioning.  (*Id.*)  She also noted Brooks needed to take bathroom breaks five or six times in two hours.  (*Id.*)  Christopherson said Brooks actively worked with her physicians to find relief from her symptoms.  (*Id.*)  She opined Brooks would have a hard time functioning outside the home, because back pain made it difficult for her to travel to and from work.  (*Id.*)

### B.   Disability Reports

Brooks completed the SSA form, "Function Report-Adult," on March 8, 2008.  (Admin. R. at 245-51.)  She described her daily activities as getting her children ready for school, trying to do some housework, lying down before her children came home from school, then making supper.  (*Id.* at 244-45.)  She had some difficulty with personal care due to back pain, and she was not motivated to shower every day.  (*Id.* at 245.)  She could do laundry, sweep, mop, and make dinner daily.  (*Id.* at 246.)  She shopped for groceries when necessary.  (*Id.* at 247.)  Brooks did not go out often, because she did not like to deal with people.  (*Id.*)  She could not pay attention for long.  (*Id.* at 249.)  She was depressed and did not have friends.  (*Id.* at 251.)

Brook's friend of ten years, Amber Robinson, completed a "Function Report – Adult – Third Party" form regarding Brooks for the SSA.  (*Id.* at 252-59.)  Robinson said Brooks' hobbies were reading, playing computer games and watching television, which she did every day, if she was not depressed.  (*Id.* at 256.)

Brooks completed another "Function Report-Adult" on August 31, 2008.  (*Id.* at 282-89.) She had unusual sleep patterns, sometimes sleeping all day, other times she could not sleep.  (*Id.* at 283.)  She needed reminders for personal grooming, and only made simple meals.  (*Id.* at 284.) She could not keep up with cleaning and laundry.  (*Id.*)  She rarely shopped, because it made her anxious.  (*Id.* at 285.)  She could not be around others without having panic attacks.  (*Id.* at 287.) Brooks tried going to school to study nursing, but quit in the third semester due to back pain and panic attacks.  (*Id.* at 289.)

Brooks' friend of six years, Eloise Nussbaum, completed a "Function Report – Adult – Third Party" regarding Brooks for the SSA on September 5, 2008.  (*Id.* at 290-97.)  Nussbaum saw Brooks once or twice a week to go out for meals or "get-togethers."  (*Id.* at 290.)  Nussbaum said Brooks "cares for the home and children.  Cooks, cleans, does laundry, cleans yard, paints, & cares for friends children."  (*Id.* at 290-91.)  In response to a question about whether there were things Brooks used to do, but could no longer do because of illness, Nussbaum said, "normal activities like swimming, lifting, camping & hunting & she still does these things."  (*Id.* at 291.)  Nussbaum said Brooks could do yard work, including lifting 50 pound bags or two cement blocks at a time, and removing metal and wood from her yard and shed.  (*Id.* at 292.) She said Brooks could do these things in a normal amount of time "if not drunk or spaced out on pills."  (*Id.*)  Nussbaum also said Brooks had a gambling and drinking problem, and she could not handle money due to drinking and taking too many pills.  (*Id.* at 293-94.)  Nussbaum said Brooks went shopping, "partying," drinking, eating out, and gambling once or twice a week.  (*Id.* at 294.)  In a narrative, Nussbaum said:

> I think someone should set up a visit or just show up at her residence & take pictures.  She does yard work & house work with no problems.  They just moved into their house a month or so ago & she packed, unpacked, moved & carried furniture, put up the bed

    & painted.  She also carried and distributed rock around house.
Her mental problems are from lying to doctors to get a lot of
different pills for made up illnesses.

(*Id.* at 297.)

###### C.    Administrative Hearing

At the time of the administrative hearing, Brooks was 36-years-old.  (Admin. R. at 31.)

She is a high school graduate.  (*Id.*)  She is single, and lives with her boyfriend, her two children,

aged twelve and six, and her boyfriend's four children.  (*Id.* at 32, 40.)  Brooks' oldest child is on

disability for attention deficit hyperactive disorder and oppositional defiant disorder

("ADHD/ODD").  (*Id.* at 40.)

In 2007, Brooks worked as a certified nursing assistant ("CNA"), and took medical leave

to have uterine ablation.  (*Id.* at 33, 34, 39.)  Her CNA license was invalid for failure to put in

enough training or work hours over the year, so she was terminated from her job while on leave,

and she received unemployment benefits.  (*Id.* at 34, 38.)  She was also seeing a chiropractor for

her back, and had fusion surgery in September 2008.  (*Id.* at 36, 39.)  She continued to take

Percocet for back pain.  (*Id.* at 43.)  She also had osteopenia, which was treated by injection.  (*Id.*

at 49.)  Brooks had right wrist surgery in September 2010, and continued to have difficulty

grasping and opening jars.  (*Id.* at 50-51.)  She also continued to have daily headaches.  (*Id.*)  Her

medication side effects were dizziness, lightheadedness and grogginess.  (*Id.* at 51-52.)  She

spent half the day lying down.  (*Id.* at 52.)

Brooks said she was stressed and frustrated, because she could no longer do the things

she used to do, such as yard work, housework and shopping.  (*Id.* at 44.)  Depression made her

isolate and uncomfortable around people.  (*Id.* at 54.)  Her anxiety symptoms were chest

tightness and difficulty breathing.  (*Id.*)  Brooks had panic attacks lasting fifteen to twenty

minutes, approximately twice a month. (*Id.*) When having a panic attack, she had to seclude herself to calm down. (*Id.*) Brooks had difficulty sleeping, tossed and turned all night, and dozed off during the day. (*Id.* at 54-55.) She had difficulty completing tasks, due to boredom or frustration. (*Id.*) She had problems with her bladder, and frequently needed to go to the bathroom. (*Id.*) Brooks could only sit for fifteen to thirty minutes, because she had sharp pains in her back. (*Id.* at 52.) She could only stand in one position for fifteen minutes without severe pain. (*Id.* at 52-53.) She could walk five or six blocks, and then needed a break. (*Id.* at 53.) She could only comfortably lift a gallon of milk. (*Id.*)

Wayne Onken[12] testified as a vocational expert. (*Id.* at 28.) The ALJ asked Onken whether a person who would be limited to lifting and carrying twenty pounds occasionally, ten pounds frequently; sitting for six hours out of an eight-hour workday; standing and/or walking six hours out of an eight-hour workday; limited to low stress, routine, 3-4 step work, and brief and superficial contact with the public would be able to perform Brooks' past relevant work. (*Id.* at 41.) Onken testified that such a person could not perform the nursing job, but could perform Brook's past job as an injection molding machine operator. (*Id.* at 42.) There would be more than 700 such jobs in Minnesota. (*Id.*) Brooks' attorney read Dr. Petersen's responses on the April 28, 2010 multiple impairment questionnaire[13] into the record, and then asked the vocational expert whether such a person could perform any of Brooks' past relevant work. (*Id.* at 45-48.) Onken testified that she could not. (*Id.* at 48.)

---

[12] Onken was misidentified by the hearing transcriber as "Mr. Atkin." (Admin. R. at 28.) The correct spelling of the vocational expert's name is found on the Vocational Analysis Report. (*Id.* at 360.)

[13] Exhibit 35F (Admin. R. at 911-918).

D.     **ALJ's Decision**

The ALJ found Brooks had the residual functional capacity for light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), further restricted to simple routine tasks, low stress, limited public contact, and brief and superficial contact with others.  (*Id.* at 17.)  The ALJ discounted Brooks' credibility regarding the severity of her limitations based on the objective medical evidence, her course of treatment, her daily activities, her sporadic employment with multiple employers, and her failure to seek vocational or rehabilitation training.  (*Id.*)  She also received unemployment benefits, suggesting she had the ability to work during the same period she alleged disability.  (*Id.*)

After Brook's spinal surgery, there was no evidence of herniations or stenosis, neurological deficits or difficulties with gait.  (*Id.*)  Brooks' weight was stable after gastric bypass surgery.  (*Id.*)  There was no objective evidence to explain her headaches.  (*Id.* at 17-18.)  Furthermore, she was treated conservatively with medication, with some stabilization and no reported side effects.  (*Id.* at 18.)  Brooks only went to a pain clinic for a short time, and she was not complaint with recommendations for epidural steroid injections or counseling.  (*Id.*)  Regarding her depression, Brooks took medication provided by her family physician, and failed to follow numerous recommendations to see a mental health provider until July 2010.  (*Id.*)

Next, the ALJ considered the opinion evidence and gave significant weight to the state agency medical consultants' opinions.[14]  (*Id.*)  The ALJ found the that state agency medical consultants' opinions were consistent with the overall evidence of record, and with Brooks' moderate limitations in daily living, social functioning, and concentration, persistence or pace.

---

[14]  The ALJ cited exhibits 11F, 12F, 24F, and 25F, which represent the opinions of Drs. Unversaw, Salmi, Nelsen and Larson.  (Index and Admin. R. at 486-89, 490-97, 675-78, 679-86.)

(*Id.*)  However, the ALJ did not find evidence in the record to support the postural limitations found by the state agency medical consultants.  (*Id.*)  Furthermore, the ALJ did not give controlling weight to Dr. Petersen's opinion, because it was largely based on Brooks' subjective complaints, which were not fully credible.  (*Id.*)  The ALJ also concluded Dr. Petersen's opinion was not supported by clinical findings, diagnostic techniques, and was not consistent with other significant evidence in the record.  (*Id.* at 18-19.)

The ALJ also considered but discounted the opinions of Dr. Barnes and Dr. Hoffman, because their opinions were based on Brooks' subjective complaints, which were not credible. (*Id.* at 19.)  The ALJ discounted Lynnette Christopherson's opinion that Brooks would have a hard time functioning outside her home.  (*Id.*)  Furthermore, in discussing why Brooks did not meet or equal a listed impairment, the ALJ noted that in addition to caring for herself and doing housework, Brooks cared her two children and her elderly mother.  (*Id.* at 16.)  And, although Brooks reported social isolation, she related appropriately to examining and treating sources, and maintained stable interpersonal relationships.  (*Id.*)  Finally, on mental status examinations, Brooks was fully oriented, with logical, goal-directed thought process.  (*Id.*)

## II.     STANDARD OF REVIEW

To receive SSI benefits, an individual must be found disabled as defined by the Social Security Act and accompanying regulations.  *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C § 423(d)(1)(A).   It is the claimant's burden to prove disability. *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011).

On review of a decision denying Social Security benefits, a court examines whether the findings and conclusion of the ALJ are legally sound and "supported by substantial evidence in the record as a whole." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (citation omitted). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's decision." *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (citation omitted).  Although the court must consider "[e]vidence that both supports and detracts from the ALJ's decision," the ALJ's decision may not be reversed merely because some evidence supports another outcome.  *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). If it is possible to reach conflicting positions from the record, but one of those positions is that of the ALJ, the  decision must be affirmed.  *Id.*

## III.   DISCUSSION

### A.   Dr. Petersen's Opinion

Brooks asserts the ALJ should have given controlling weight to Dr. Petersen's opinion of her physical residual functional capacity, because his opinion is supported by clinical evidence, including tenderness with palpation, decreased lumbar spine flexion and extension, slow squatting with back pain, and the results of two MRIs.  Brooks contends Drs. Salmi and Larson were non-examining physicians who did not review all evidence in the record, and their opinions did not deserve significant weight.  Even if the ALJ was not required to grant Dr. Petersen's opinion controlling weight, Brooks argues the ALJ erred by failing to indicate how much weight he gave Dr. Petersen's opinion, based on the factors described in 20 C.F.R. §§ 404.1527(c)(2) and  416.927(c)(2).   The Commissioner contends Dr. Petersen's treatments notes, while supporting a severe back impairment, do not support disabling functional limitations. Dr. Petersen's opinion was based on Brooks' subjective complaints, which were not credible.

On the other hand, the state agency reviewing physicians' opinions, excluding the postural limitations, were consistent with the record.

Because the ALJ's analysis of the opinion evidence and Brooks' credibility are intertwined, the Court will address the issues together.  Regarding credibility, Brooks contends the ALJ incorrectly found that there were no radiographic abnormalities of her spine documented in the record, because she had a disc protrusion, followed by surgery, and chronic compression fracture.  Brooks asserts the ALJ was incorrect in finding her treatment was conservative, because she had surgery and used multiple heavy narcotic medications.  Brooks argues her marginal daily activities did not indicate an ability to work in a competitive job environment. Finally, Brooks asserts she had a good work history, despite changing jobs frequently.  And, her receipt of unemployment benefits does not preclude receipt of disability benefits.

In support of the ALJ's credibility determination, the Commissioner contends there was no evidence of herniations, stenosis, neurological deficits or difficulties with gait after Brooks had surgery.  There were no findings to explain Brooks' headaches.  Brooks' depression was adequately treated with medication.   And, Brooks failed to comply with numerous recommendations to see a mental health counselor and attend a pain clinic.  Brooks also missed physical therapy appointments.  Brooks' daily activities, including caring for her children and elderly mother, and her occasional activities, such as packing, helping friends, and staying up late cleaning, were not consistent with her subjective allegations.  The Commissioner concludes the record as a whole supports the ALJ's decision to discount Brooks' credibility.

Brooks had a long history of chronic lumbar pain, most of which time Brooks was able to work.  However, when a discography was consistent with the location of a small disc protrusion shown on MRI, Dr. Denis thought lumbar fusion was reasonable, and surgery was performed in

September 2008. Five weeks after lumbar surgery, Brooks' fusion was intact, and Dr. Denis wanted Brooks to decrease the amount of narcotics she was taking. Ignoring her post-operative lifting restrictions, Brooks exceeded her lifting restriction while packing to move to a new house. She exacerbated her back pain again by helping friends lift a door, and later, by caring for her elderly mother. Dr. Phillips was frustrated with unsuccessful efforts to get Brooks to attend a pain clinic, because he wanted to discontinue prescribing narcotics. After Brooks' surgery, the only objective clinical findings of lumbar pain were tenderness on examination, reduced range of motion on occasions, and primarily old compression fractures secondary to osteopenia.

Dr. Petersen's opinion of Brooks' limitations is inconsistent with Brooks' clinical improvement after fusion surgery, her activities, and with Drs. Denis' and Phillips' efforts to have Brooks discontinue narcotic pain medication after recovery from surgery. In fact, a friend of Brooks, in a third-party report dated after Brooks' back surgery, said that Brooks continued to do heavy yard work, falsely used doctors to obtain medications for recreational use, and had a drinking problem as well. Thus, when the Court considers all evidence in the record, it is inconsistent with Dr. Petersen's opinion.

State agency consultants' opinions "can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence . . . the consistency of the opinion with the record as a whole . . . and any explanation for the opinion provided [by the consulting physician]. Social Security Ruling 96-6p, 1996 WL 374180 at *2. In appropriate circumstances, an ALJ may grant more weight to a state agency physician's opinion than a treating physician's opinion. *Id.* at *3. Drs. Salmi and Larson reviewed Brooks' file as of the date of their opinions, June 2008 and October 2009, and

restricted Brooks to a limited range of light work.  Their opinions were based primarily on the lack of neurological symptoms and limited clinical findings after Brooks' lumbar fusion.

Because Brooks' subjective complaints of disabling pain were not credible, Drs. Salmi and Larson's opinions were more consistent with the record as a whole than Dr. Peterson's opinion.  The ALJ, therefore, properly granted their opinions greater weight.  *See Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) ("The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole."); *Renstrom v. Astrue*, 680 F.3d 1057, 1064-65 (8th Cir. 2012) (ALJ properly decided to give treating physician's opinion non-controlling weight because it was largely based on claimant's subjective complaints; and ALJ's determination to give less weight to treating physician's opinion over other medical opinions was reasonable because treating physician's opinion was contradicted by other objective evidence in the record.)  Moreover, because Brooks' daily activities after her lumbar surgery were also inconsistent with any postural limitations, the ALJ properly excluded these limitations from his RFC determination.  *See Webster v. Astrue*, 628 F.Supp.2d 1073, 1089 (D.Neb. June 19, 2009) (citing *Graves v. Social Security Admin.*, 2009 WL 205005, at *10 (D.Neb. Jan. 26, 2009) ("because some examining physician's opinions were contradicted by record, ALJ did not err by failing to adopt those portions of the opinion in full.")

### B.    Drs. Barnes and Hoffman's opinions

Brooks also challenges the ALJ's rejection of the opinions of two psychological consultative examiners, Dr. Barnes and Dr. Hoffman, both of whom interviewed and evaluated Brooks, opining her mental impairments would preclude employment.  Brooks contends their opinions should have been granted significant weight, because they were based on proper

psychiatric methodology, and were consistent with frequent references in the record to Brooks' depression and anxiety.[15]  Brooks contends the ALJ erred by granting more weight to the non-examining state agency psychological consultants' opinions, and that the ALJ's evaluation of the medical opinions is not based on substantial evidence in the record.  In contrast, the Commissioner contends the ALJ properly rejected Drs. Barnes and Hoffman's opinions, because they were based on Brooks' subjective complaints, which were not credible.

Dr. Unversaw, the state agency psychological consultant who reviewed Brook's file on June 11, 2008, disagreed with Dr. Barnes' opinion, because the activities Brooks reported to Dr. Barnes were not consistent with the activities Brooks reported on her own disability report, or on a third party's report. Another state agency psychological consultant, Dr. R. Owen Nelsen, reviewed Brooks' file in October 2009, and agreed with Dr. Unversaw's opinion that Brooks could perform simple, routine tasks, with limited interaction with others.

Brooks told Dr. Barnes that she got her children ready for school each day; then, she spent the rest of the day in bed.  However, on March 8, 2008, in a Disability Report, Brooks said she could do laundry, sweep, mop, and make dinner daily.  Brooks' friend of ten years, Amber Robinson, said Brooks' hobbies were reading, playing computer games and watching television, which she did every day, if she was not depressed.  Despite submitting Robinson's report to the SSA, Brooks told Dr. Barnes she had no friends.

On August 24, 2009, Brooks told Dr. Hoffman she had no energy to do anything and needed help with everything on a daily basis.  However, another "friend" of Brooks completed a third-party function report in September 2008, after Dr. Barnes' evaluation but before Dr. Hoffman's evaluation, and reported, in so many words, that Brooks was faking her pain and

---

[15]     The frequent references in the record were that Brooks was stressed, primarily because she was caring for her elderly mother before she went into assisted living.

mental illness.[16]   According to Nussbaum, Brooks' interactions with medical providers were motivated by her desire to get medications for recreational use, which she abused along with alcohol.  Nussbaum said Brooks could accomplish tasks at a normal pace, if she was not "drunk or spaced out on pills." She also said Brooks went shopping, "partying," drinking, out to eat, and gambling once or twice a week.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (factors that should be considered in evaluating subjective complaints include observations by third parties.)

Brooks appeared to Dr. Barnes and Dr. Hoffman to be irritable and overwhelmed by stress, but Nussbaum provided an explanation other than depression, anxiety, or pain that could have caused Brooks' appearance.  Nussbaum's report is consistent with other evidence in the record, including Brooks' failure to attend a pain clinic or physical therapy, presumably because she did not want to discontinue narcotic medications, as Drs. Denis and Phillips wanted.  Brooks' failure to obtain counseling for depression and anxiety, instead, asking for increases in medication from her primary doctor, is also consistent with Nussbaum's portrayal of Brooks. For these reasons, the state agency psychological consultants' opinions are more consistent with the record as a whole; and the ALJ properly adopted their opinions over the opinions of Drs. Barnes and Hoffman.  Needless to say, there is substantial evidence in the record supporting the ALJ's credibility finding.

---

[16] The ALJ did not specifically cite Nussbaum's report in his decision, but the reviewing court is required to review the administrative record as a whole and to consider: 1) the credibility findings made by the ALJ; 2) the plaintiff's vocational factors; 3) medical evidence from treating and consulting physicians; 4) the plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments; 5) *any corroboration by third parties of the plaintiff's impairments*; and 6) the testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.  Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)) (emphasis added).

**IV.      CONCLUSION**

Being duly advised of all the files, records, and proceedings herein, IT IS HEREBY

RECOMMENDED THAT:

1.      Plaintiff's motion for summary judgment (Doc. No. 7) be DENIED.

2.      Defendant's motion for summary judgment (Doc. No. 12) be GRANTED.

3.      If this Report and Recommendation is adopted, that judgment be entered
        accordingly.


Dated:  August 7, 2012                      _s/ *Jeanne J. Graham*_____
                                            JEANNE J. GRAHAM
                                            United States Magistrate Judge


**NOTICE**


Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **August 23, 2012**.  A party may respond to the objections within fourteen (14) days after service thereof.   Any objections or responses shall not exceed 3,500 words.  The district judge will make a de novo determination of those portions of the Report and Recommendation to which an objection is made.